**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| Fabrieal Delaney (#43749-424), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 25 C 50211 |
| v. | ) | |
| | ) | Hon. Iain D. Johnston |
| United States of America, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

The Court grants Plaintiff's application for leave to proceed *in forma pauperis* [4] and orders the trust fund officer at Plaintiff's place of incarceration to deduct $30.66 from Plaintiff's account for payment to the Clerk of Court as an initial partial payment of the filing fee and to continue making monthly deductions in accordance with this order. As detailed in the "Statement" section of this order, Plaintiff's Federal Tort Claims Act claim may proceed. The Court directs the Clerk of Court to (1) send a copy of this order to the trust fund officer at Plaintiff's place of incarceration and to the Court's Fiscal Department; (2) file Plaintiff's complaint [1]; (3) issue summons for service of the complaint on the United States of America; and (4) send Plaintiff a copy of this order. Additionally, to serve the United States, the Clerk shall: (1) send a copy of the summons and a copy of the complaint to the civil-process clerk at the United States Attorney for the Northern District of Illinois, via registered or certified mail; (2) send a copy of the summons and a copy of the complaint to the Attorney General of the United States at Washington, D.C., via registered or certified mail; and (3) send a copy of this order, along with a copy of the summons and a copy of the complaint, to Tom Walsh, Chief, Civil Division, United States Attorney's Office for the Northern District of Illinois. Plaintiff is instructed that he has an obligation to promptly update his address if it changes while this case is open. If he does not keep the Court informed of his address, this lawsuit may be dismissed with no further notice. As a one-time courtesy, the Court has confirmed Plaintiff's recent transfer to USP-Canaan and has updated the docket to reflect his new address at that location. Until the United States responds to the complaint, nothing is required from Plaintiff other than promptly updating his address as necessary. Plaintiff's motion for attorney representation [3] and his motion to revise his complaint [9] are dismissed without prejudice.

## STATEMENT

Federal prisoner Fabrieal Delaney, currently an inmate at USP Canaan, brings this lawsuit under the Federal Tort Claims Act ("FTCA") regarding events that occurred while he was incarcerated at USP Thomson in December 2021 and January 2022. Plaintiff requests leave to proceed *in forma pauperis* and has demonstrated that he cannot prepay the Court's filing fee. The Court therefore grants his application to proceed *in forma pauperis*.

Pursuant to 28 U.S.C. § 1915(b), the Court orders: (1) Plaintiff to immediately pay (and the facility having custody of him to automatically remit) $30.66 to the Clerk of Court for payment of the initial partial filing fee and (2) Plaintiff to pay (and the facility having custody of him to automatically remit) to the Clerk of Court "20 percent of the preceding month's income credited to" Plaintiff's account "each time the amount in the account exceeds $10" until the $350.00 filing fee has been paid in full. Income for purposes of calculating payments under § 1915(b) includes all deposits to an inmate's trust fund account, including but not limited to gifts and bequests. *Lucien v. DeTella*, 141 F.3d 773, 776 (7th Cir. 1998). All payments shall be sent to the Clerk of Court, United States District Court, 219 South Dearborn Street, Chicago, Illinois 60604, attn: Cashier's Desk, 20th Floor, and should clearly identify Plaintiff's name and the case number assigned to this case. In the event Plaintiff is transferred prior to his debt being paid off in full, the Court directs the trust fund officer to send a copy of this order to the transferee facility.

The Court next considers Plaintiff's complaint. The Court must screen the complaint and dismiss it, or any portion thereof, if the complaint is frivolous or malicious, fails to state a claim on which relief may be granted, or seeks monetary relief from an immune defendant. *See* 28 U.S.C. § 1915A; *Jones v. Bock*, 549 U.S. 199, 214 (2007). A complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), while giving the defendant "fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint also must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," which means that the pleaded facts must show there is "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When screening a *pro se* plaintiff's complaint, courts construe the allegations liberally. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam). Courts also "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiff's favor." *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020).

Plaintiff's factual allegations are extremely detailed, set forth in a densely-cramped, handwritten "statement of facts" that spans eleven pages. For screening purposes, the Court summarizes his allegations as follows: On December 17, 2021, Plaintiff told several officers that he was feeling suicidal and requested to speak to someone from "psychology." Dkt. 1, pg. 8.[1] Seeing Plaintiff with a sheet wrapped around his neck, Officer Brunson told him "You're going to have to try harder than that." *Id*. When Officer Brunson later saw Plaintiff standing on the desk with a sheet tied around his neck, he began to spray OC (mace) into his cell, continuing to spray even after Plaintiff hopped down from the desk and untied the sheet from his neck. *Id.* Plaintiff wrote a letter to Warden Ciolli complaining that Officer Brunson had sprayed him improperly, destroyed Plaintiff's legal work in the process, and failed to contact psychology when Plaintiff was feeling suicidal. *Id.*

Twelve days later, on December 29, 2021, Plaintiff overheard Officer Brunson tell Officer Cook, "Delaney wrote me up to the Warden like a faggot snitch he is." *Id.* Officer Cook replied that Plaintiff "will find out soon what we do to filers." *Id.*, pg. 13. That same day, Officer Brunson instructed Plaintiff to "cuff up," then proceed to uncuff Plaintiff's cellmate (Renee Ellis) and watch while Ellis punched Plaintiff in his face and head. *Id.*, pg. 8. (During this altercation, Officer Hardin

[1] For ease of review, the Court has taken the liberty of correcting spelling and grammar when citing to Plaintiff's statement of facts.

was stationed outside Plaintiff's cell in a manner that blocked the camera's view. *Id.*, pgs. 8, 21.) Officer Brunson eventually sprayed OC into the cell to break up the fight. *Id.*, pg. 8. Plaintiff was then rinsed off and placed in a restraint chair with "extremely tight" handcuffs. *Id.* Officer Brunson entered the cell where Plaintiff was restrained and slammed his shield down on Plaintiff's wrists – to the point his skin was cut by the restraints – telling Plaintiff, "Write my name in grievances again and you're going to get fucked up again." *Id.* Officer Cook slammed the shield on Plaintiff's wrists, as well. *Id.*, pg. 13. Plaintiff told Lieutenant Williams that Officer Brunson had set-up Plaintiff to be attacked by Ellis, and Lieutenant Williams responded, "This is what happens to faggots who snitch on my staff." *Id.* While Plaintiff was crying from the excruciating pain the restraints were causing him, he begged Nurse Miller to loosen the restraints. *Id.* In response, Nurse Miller laughed and said, "Lieutenant, the restraints look fabulous." *Id.* When Plaintiff was released from the restraint chair, he was issued an incident report for allegedly attacking Ellis. *Id.*, pg. 8. Plaintiff was eventually returned to his cell, where he discovered that much of his personal property was missing or destroyed. *Id.*, pgs. 8-9.

From December 30, 2021, to January 4, 2022, Thomson staff attempted to house Plaintiff with four difference cellmates. *See generally id.*, pgs. 9-14. Each time, Plaintiff raised safety concerns and accused staff of trying to get other inmates to attack him. *Id.*

On December 30, 2021, Plaintiff objected to being celled with inmate Delaboin because Plaintiff is a transgender inmate who came from a "drop-out gang institution." *Id.*, pg. 9. Plaintiff was then pulled from his cell and placed in a holding cage. *Id.* Officer Brunson found him there and told Plaintiff, "I thought you were from Chicago, stop being a faggot bitch. This is what happens to faggots who write me up." *Id.* While in the holding cage, Plaintiff began crying hysterically and informed Dr. Levy that he believed staff was trying to get other inmates to harm him and possibly kill him while he was in restraints. *Id.* After Plaintiff begged to be placed on suicide watch – to save him from himself, from staff, and from other inmates who wanted to violently kill him – he was escorted to an observation room. *Id.* As Plaintiff left the F building, Officer Brunson and the first shift staff told Plaintiff, "We will get you when you come tomorrow back here." *Id.*

The next day, on December 31, 2021, Lieutenant Willaims came to the observation room (where Plaintiff was on suicide watch) and told Plaintiff he was going to be housed with inmate Bailey. *Id.* Plaintiff objected to being celled with inmate Bailey because he was from an active gang yard and "is a enemy to Plaintiff." *Id.* Lieutenant Williams responded, "I don't care you faggot little bitch, you're going in with Bailey or I'm going to put you in the chair for three nights straight. You will beg me to take you out, I promise." *Id.* Plaintiff began to cry while explaining to Lieutenant Williams that staff was trying to get inmates to kill him. *Id.* Lieutenant Williams ignored Plaintiff and, while leaving to assemble a tact team, told Plaintiff, "We told you we'd get you." *Id.*, pgs. 9-10. Plaintiff was then put in the restraint chair and escorted from the observation room back to the F-unit. *Id.*, pg. 10.[2]

During the first 2-hour check on December 31, 2021, while Plaintiff was in the restraint chair, Officer Brunson came in and repeatedly slammed his shield down on Plaintiff's wrist

[2] While on suicide watch, Plaintiff told Dr. Pliess that he was still feeling suicidal. Dkt. 1, pg. 10. Dr. Pliess told Plaintiff, "Stop your crying like you're a little bitch. No one is trying to assault you." *Id.*

restraints (causing his wrists to start bleeding), yelling, "Fuck you faggot, and Ciolli, I'm going to make sure your dick sucking mouth never again speaks my name." *Id*. As Officer Brunson assaulted Plaintiff, Lieutenant Williams stood by laughing. *Id.* When Plaintiff complained to Captain Weiss, on Jan. 1, 2022, explaining that he had done nothing wrong, that staff had fabricated incident reports involving Plaintiff and assaulted him while in the restraint chair, and that he had not been fed or allowed to use the toilet, Captain Weiss responded, "You just don't get it. We run Thomson, not you. My advice is try not to piss off Lieutenant Williams again." *Id.*, pgs. 11, 13.[3] Captain Weiss then approved Plaintiff for 24 more hours in the restraint chair. *Id.*

For a total of 55 continuous hours, from December 31, 2021, to January 2, 2022, Plaintiff remained in restraints so tight that they cut his wrists and he blacked out on more than one occasion. *Id.*, pgs. 10-11. He also received no food and was not allowed to use the bathroom facilities, resulting in Plaintiff urinating on himself multiple times. *Id.* He was assaulted by unknown officers ("whoever was holding the shield") during routine 2-hour checks, with staff members repeatedly slamming the shield down on his extremely tight wrist restraints. *Id.,* pg. 10. Unnamed lieutenants watched as these assaults took place. *Id.*, pg. 11.

On January 2, 2022, Plaintiff was released from the restraint chair and briefly housed with inmate Tsootie. *Id.* Prior to returning to his cell, Plaintiff explicitly asked Lieutenant Marquez if he was setting him up, and Lieutenant Marquez assured Plaintiff that everything was okay. *Id.* Plaintiff again asked for reassurance after Tsootie saw Plaintiff and taunted him saying, "You know what time it is homeboy, get ready" and then tried to run up on Plaintiff. *Id.* Again Lieutenant Marquez told Plaintiff, "You will be okay. He's not going to fight you." *Id.* Lieutenant Marquez then pushed Plaintiff into the cell. *Id.* After both inmates were released from restraints, Tsootie started swinging on Plaintiff and landed some punches to Plaintiff's head. *Id.* Plaintiff never fought back and eventually Lieutenant Marquez fired a pellet gun to end the attack. *Id.* As a result of the altercation with inmate Tssotie, Plaintiff was again placed in the restraint chair (for another 24 hours). *Id.* For the third night in a row, Plaintiff received no food, was denied use of the toilet, and was subjected to extremely tight restraints that cut into his already damaged wrists. *Id.* Plaintiff cannot remember who slammed the shield on his wrists that night, but recalls that it happened. *Id.*

On January 3, 2022, Plaintiff was briefly released from the restraint chair and assigned to a cell with inmate Sims. *Id.*, pgs. 11-12. When Plaintiff balked – noting that other inmates were yelling at Sims to "crush" Plaintiff – Officer Marquez told an unknown officer to "take down" Plaintiff for refusing to go into his cell, and the officer "slammed" Plaintiff to the ground. *Id.*, at pgs. 11-12, 16. Plaintiff was again placed in the restraint chair for the fourth night in a row with no food and no use of the toilet. *Id.*, pg. 12. Again, Plaintiff was assaulted at least once with a shield. *Id.* Plaintiff's knees and back were throbbing with pain and his lips split from dehydration. *Id.*

On January 4, 2022, Plaintiff was released from the restraint chair. *Id.* During what Plaintiff describes as his "four nights of torture," he was not once allowed to use the toilet or stretch his

[3] Multiple other officers told Plaintiff that Lieutenant Williams was the main decision maker with respect to keeping Plaintiff in restraints, including the second shift lieutenant on December 31, 2021 ("I can't let you out, you upset Lieutenant Williams") and the third shift lieutenant on January 1, 2022 ("Orders from Williams is to keep you in this chair. What did you do?"). Dkt. 1, pg. 14.

limbs, and he received only one meal. *Id.* Throughout this time period, Plaintiff was seen by various nurses. Some of the nurses documented Plaintiff's injures and instructed officers to loosen his restraints, while many others falsified records by not recording Plaintiff's injuries or falsely documenting that the restraints moved freely and were not too tight. *Id.*, at pgs. 15-18. At one point, Lieutenant Williams told Plaintiff, "You keep snitching to the nurses, [but] they won't help you. They're on our side." *Id.,* pg. 14. He then ordered staff to tighten Plaintiff's restraints, and staff laughed while Plaintiff screamed in agony. *Id.*

Plaintiff names the United States as the sole defendant to his FTCA claim, alleging that the federal government is liable for eighteen separate violations, including: assault, battery, abuse of process, intentional infliction of emotional distress, negligence, medical negligence/malpractice, failure to train and supervise, and civil conspiracy. He seeks $40,000,000 in compensatory, punitive and nominal damages.

The FTCA provides a limited waiver of federal sovereign immunity, allowing civil actions against the United States for conduct of federal agents considered tortious under state law, with certain enumerated exceptions. *See* 28 U.S.C. §§ 1346(b)(1), 2680(a), (h); *see also Keller v. United States,* 771 F.3d 1021, 1022-23 (7th Cir. 2014). When analyzing an FTCA claim, the Court looks to the law of the state where the alleged misconduct occurred. *Parrott v. United States*, 536 F.3d 629, 635 (7th Cir. 2008). Plaintiff was housed at USP Thomson at the time his claims arose. Accordingly, to bring an FTCA claim, Plaintiff must articulate some action or inaction on the part of a federal official that would constitute a tort under Illinois law if committed by a private individual. *Love v. United States*, 17 F.4th 753, 755 (7th Cir. 2021). While assault, battery, and abuse of process are among the state torts as to which the United States does *not* generally waive its sovereign immunity, there is an exception for these types of intentional torts if they arise from the acts or omissions of law enforcement officers. *See* 28 U.S.C. § 2680(h).[4]

Having reviewed the allegations set forth in the complaint, the Court concludes Plaintiff may proceed with claims of assault, battery, intentional infliction of emotional distress, medical negligence/malpractice,[5] failure to train and supervise, and civil conspiracy under the FTCA, subject to any defenses available to the United States. The Court directs the Clerk of Court to issue summons for service of the complaint on the United States as set forth above.

Plaintiff may not proceed with his claims for abuse of process, as this tort pertains to the use and abuse of legal process, and Plaintiff has not alleged the existence of any litigation or court

---

[4] At this stage of the proceedings, the Court assumes without deciding that Officer Brunson, Officer Cook, Officer Hardin, Lieutenant Williams, Lieutenant Marquez, and Captain Weiss are all law enforcement officers for the purposes of § 2680(h). *See Millbrook v. United States*, 569 U.S. 50, 57 (2013) (holding that "the waiver effected by the law enforcement proviso [in § 2680(h)] extends to acts or omissions of law enforcement officers that arise within the scope of their employment, regardless of whether the officers are engaged in investigative or law enforcement activity, or are executing a search, seizing evidence, or making an arrest").

[5] Although Plaintiff need not support his complaint with an affidavit or other medical testimony, the Court cautions him that he will at some point need to produce a certificate of merit, which Illinois law requires for any complaint asserting claims of medical negligence or healing art malpractice. 735 ILCS 5/2-622(a); *Young v. United States*, 942 F.3d 349, 351-52 (7th Cir. 2019).

proceedings initiated by federal actors employed at Thomson. *See Kumar v. Bornstein*, 820 N.E.2d 1167, 1173 (Ill. App. Ct. 2004).

Likewise, Plaintiff's allegations cannot support a claim for negligence based on the intentional acts of Thomson staff. *See, e.g., Cavalier v. Speedway, LLC*, No. 20-cv-03883, 2024 WL 1363413, at *10 (N.D. Ill. Mar. 29, 2024) ("The overwhelming majority of the Fourth Amended Complaint's allegations concerning Bohler's actions do not sound in negligence but instead plead a purely intentional tort."); *Hamilton v. United States*, No. 18-cv-02017, 2019 WL 224255, at *2 (S.D. Ill. Jan. 16, 2019) ("[W]hile Count I of the complaint is captioned 'negligence,' all of the alleged negligent activity therein are commissions of *other* intentional torts […]. That is not negligence, but rather a bundle of separate state law claims hidden under a negligence label[.]").

The Court acknowledges that Plaintiff has filed a "request to revise my civil tort claim filed with this court," Dkt. 9, which the Court construes as a motion for leave to file an amended complaint. According to Plaintiff, he has "revised his tort claim w/ more facts and exhibits attached to support his claim," although Plaintiff does not further identify the specific facts or exhibits he seeks to add. *Id.*, pg. 1. Because Plaintiff's FTCA claim is proceeding, as set forth above, there is no need for Plaintiff to submit an amended complaint with additional facts and exhibits at this time. Moreover, the Court cannot grant Plaintiff's request without first reviewing the proposed amended complaint. In other words, Plaintiff's description of what he *intends* to file is not enough. Should he wish to file an amended complaint in the future, for any reason, Plaintiff must submit a proposed amended complaint for the Court's review pursuant to 28 U.S.C. § 1915A, along with a motion for leave to amend. Plaintiff is advised that any proposed amended complaint must stand complete on its own and include all claims, all defendants, and all requested relief. Piecemeal amendment will not be permitted. Plaintiff's pending motion to revise his FTCA complaint is denied without prejudice.

*Plaintiff's Motion for Attorney Representation*:

There is no right to court-appointed counsel in federal civil cases, but the Court may recruit a lawyer to represent an indigent litigant on a *pro bono* basis. *Watts v. Kidman*, 42 F.4th 755, 760 (7th Cir. 2022); *see also* 28 U.S.C. § 1915(e)(1). In deciding whether to recruit counsel, the Court must engage in a two-step analysis: (1) has the plaintiff made a reasonable attempt to retain counsel on his own or been effectively precluded from doing so; and, if so, (2) given the factual and legal complexity of the case, does the plaintiff appear competent to litigate the matter himself. *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007) (en banc).

Plaintiff's motion for attorney representation demonstrates that he has attempted to retain counsel on his own and, so far, has not been successful in finding an attorney to take his case. *See* Dkt. 3, pg. 1. Nonetheless, recruitment of counsel is not warranted at this time. This case is in its early stages, and it is "only in an 'unusual case'" that recruitment of counsel is appropriate before the defendant has even filed an appearance. *Buford v. Laborers' Int'l Union Local 269*, 787 F. App'x 341, 344-45 (7th Cir. 2019) (non precedential) (citation omitted); *see also Burton v. Chi. Transit Auth.*, No. 21-2802, 2022 WL 2287424, at *2 (7th Cir. June 24, 2022) (non precedential) ("we have acknowledged the difficulty assessing the need for counsel in the early stages of a

case"); *Pickett v. Chi. Transit Auth.*, 930 F.3d 869, 871 (7th Cir. 2019) (observing that a motion for attorney representation may be filed "so early in the case that it [i]s impossible to tell whether [the plaintiff] could represent himself adequately").

Plaintiff has competently represented himself to date and appears to be well versed regarding the requirements for and application of the FTCA. His motion for attorney representation is therefore denied without prejudice. If the case proceeds to a point where the need for counsel is more pressing, Plaintiff may renew his request for attorney representation and the Court will consider the request at that time.

The Court instructs Plaintiff to file all future papers concerning this action with the Clerk of this Court in care of the Prisoner Correspondent. Every document submitted by Plaintiff must include a certificate of service indicating the date on which Plaintiff gave the document to prison authorities for mailing. Any letters or other documents sent directly to a judge or that otherwise fail to comply with these instructions may be disregarded by the Court or returned to Plaintiff. Plaintiff is advised that he must promptly submit a change-of-address notification if he is transferred to another facility or released. Failure to do so may lead to dismissal of this action without further warning.

Date: September 3, 2025 By: ______________________

Iain D. Johnston
United States District Judge